

Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge
Dated: Wednesday, January 31, 2007 9:57:11 AM

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

IN RE: )
 )
JOHN PATRICK BALL ) CASE NO. 06-1002
 )
 Debtor. )

## MEMORANDUM OPINION

On December 21, 2006, this court granted John Patrick Ball (the "Debtor") permission to sell a condominium, located at 2 Waterfront Plaza, Morgantown, West Virginia (the "Condominium") that he claims to own jointly with is wife, Anita Ball, to Rita and Stephen Tanner for the sum of $885,000. The United States Trustee (the "USTE"), the West Virginia University Foundation, Inc. (the "Foundation"), and Ward D. Stone,[1] all object to Ms. Ball receiving any portion of the sale proceeds at the closing of the real estate transaction that purportedly represent her interest in the Condominium. They argue that Ms. Ball's purported one-half interest should be placed in an escrow account pending further orders of the court on the basis that she may not have any interest in the Condominium, and if she does, then the extent of that interest has not yet been determined. Additionally, Ms. Ball may be liable to the bankruptcy estate for preferential and/or fraudulent transfers. Ms. Ball demands that one-half of the net sale proceeds (about $225,000) be immediately paid over to her.

The court held a hearing in this case on December 12, 2006, in Wheeling, West Virginia at which time the parties agreed to allow the sale of the property to close, and to allow the proceeds of that sale to

---

[1] Ward D. Stone is the court-appointed administrator for the estates of Vivian Davis Michael, Gladys G. Davis, and Earl L. Elmore, all of whom are deceased.

1

be held in an escrow account for a short period of time to allow briefing on the issue of whether the court should order an indefinite escrow of the funds purportedly belonging to Ms. Ball. That briefing is now complete, and for the reasons stated herein, the court will continue the Debtor's motion to approve of the distribution of sale proceeds, convert the objections to the Debtor's proposed distribution of sale proceeds into a motion for a preliminary injunction under Fed. R. Bankr. P. 7065 and 9104, and hold a hearing on February 14, 2007 at 10:30 a.m. in the U.S. Bankruptcy Courtroom, located at 1125 Chapline Street, 3rd Floor, Wheeling, West Virginia 26003, at which time the parties will be given the opportunity to prove that a preliminary injunction is appropriate.

## I. BACKGROUND

The Debtor was admitted to practice law in West Virginia in 1963, and one of his practice areas was estate planning. In the course of that practice, he prepared the wills for three individuals: Vivian D. Michael, Gladys G. Davis, and Earle L. Elmore, all of whom are now deceased. The Debtor's preparation and administration of those wills formed the basis of a disciplinary action against the Debtor by the West Virginia Office of Disciplinary Counsel, which ultimately led to a five-year revocation of his license to practice law, and a $2,978,848 July 17, 2006 order of restitution. On October 31, 2006, the Debtor filed his Chapter 11 bankruptcy petition.

On November 7, 1996, the Debtor prepared the wills of two sisters: Ms. Michael and Ms. Davis. Both wills left all tangible personal property, including personal effects, household goods, and jewelry to Ms. Ball, and Ms. Michael bequeathed an automobile to the Debtor. The total value of those gifts was $64,000. After Ms. Michael died, the Debtor assisted Ms. Davis in changing the beneficiary of an annuity from her deceased sister to the Debtor's two adult children. After Ms. Davis's death, the Debtor's children received $487,783 from that annuity. Additionally, the Debtor was named the executor of both Ms. Michael's and Ms. Davis's wills, and the stated compensation for him as executor was 7.5% of the total gross estates at a time when the generally accepted maximum charge was 5%. As executor, the Debtor received $785,966 in fees from Ms. Michael's estate, and $837,362 from Ms. Davis's estate. Moreover, the wills also gave the Debtor the right to oversee funds given to the Foundation – with an associated fee of 1% of the market value of the funds. The Debtor received a total of $336,889 from the Foundation based on that oversight fee.

On September 17, 1997, the Debtor prepared a will for Mr. Elmore. The will appointed the Debtor as executor of the estate and authorized him to receive compensation at the rate of 7.5% of the total gross estate. Mr. Elmore died in 2003 leaving an estate valued at $1,388,579. Mr. Elmer also provided that the bulk of his estate would be paid to the Foundation, and allowed the Debtor to set the annual fee that he would charge for overseeing that gift. The will suggested that the fee could be 1% of the gross assets of the funds.

Based on the above-stated actions, the West Virginia Supreme Court of Appeals determined that the Debtor drafted three wills in which he gave himself excessive fees as executor, drafted two wills that improperly conveyed property to himself and his wife, and assisted in changing a client's annuity to benefit his adult children. As a result, the Supreme Court of Appeals determined that the Debtor violated West Virginia Rule of Professional Conduct 1.5(a) (prohibition on excessive fees); 1.7(b) (prohibiting representation of a client when that representation is materially limited by the lawyer's own interests); 1.8(c) (prohibition on preparing a will that gives the lawyer or a relative of the lawyer a substantial gift from the client); and 8.4(a) (prohibition against attempting to violate the Rules of Professional Conduct). Based on these ethical violations, the Supreme Court of Appeals ordered full restitution of all unethically retained funds, which was later determined to be $2,978,848.

The Debtor and Ms. Ball purchased the Condominium on December 5, 2003, for $665,135. Centura Bank has a deed of trust on the property, which had an outstanding balance of $394,681 as of December 20, 2006. The deed to the property states that the Debtor and Ms. Ball hold the property as joint tenants with the right of survivorship. Although she is listed on the deed as a joint tenant, Mr. Stone and the Foundation allege that Ms. Ball has not been employed, and has not received other earned income, for a period of at least ten years, and that she did not contribute financially to the acquisition of the Condominium.

Additionally, the USTE has identified several potential causes of action against Ms. Ball that could be asserted on behalf of the bankruptcy estate. The USTE estimates that Ms. Ball's total potential liability could be $171,000, representing an $82,000 gift made by the Debtor to Ms. Ball in the year preceding the bankruptcy filing, the $25,000 transfer of the automobile from the estate of Ms. Michael to Mr. Ball, and the transfer of $64,000 in personal goods from the estate of Mses. Michael and Davis to Ms. Ball.

3

## II. DISCUSSION

Ms. Ball argues that she is immediately entitled to her one-half interest in the Condominium on the following grounds: she a joint tenant, 11 U.S.C. § 363(j) mandates that she be paid her share on the sale of jointly-owned property, any attempt by the Debtor's creditors to deny her access to her property is a prohibited pre-judgment attachment of her property, and that this court does not have jurisdiction to impose a constructive trust (even if one were appropriate) over non-estate property.

Mr. Stone, the Foundation, and the USTE argue that it is unclear, at this time, exactly what Ms. Ball's interest – if any – is in the Condominium. Mr. Stone contends that the Debtor unethically accepted $1,942,291 from the estates of Mses. Michael and Davis before the purchase of the Condominium for $665,000, and the Debtor had notice of the charges against him by the Office of Disciplinary Counsel before its purchase. Given these allegations, Mr. Stone contends that an inquiry must be made into whether the joint deed, and the joint loan from Centura Bank, was done with the intent to hinder, delay, or defraud creditors.

The USTE states that § 363(j) does not require an immediate distribution of funds to a co-owner of property when that property is sold by the Debtor, and that this court has the inherent power under § 105(a) to escrow the proceeds to allow a reasonable investigation into pre-petition transactions.

The Foundation argues that significant questions exist as to whether the Condominium was obtained with funds to which neither the Debtor nor Ms. Ball were entitled, and that significant questions exist regarding whether Ms. Ball's interest in the property may be subject to avoidance under federal or state fraudulent transfer laws. Until the exact nature of Ms. Ball's interest is determined, no payment pursuant to § 363(j) is appropriate. Moreover, the Foundation argues, an escrow of Ms. Ball's alleged entitlement to her interest in the sale proceeds is required to protect the public interest based on the Debtor's unethical acts.

### A.  **Presumption of One-Half Ownership**

Ms. Ball contends that because she is listed on the deed to the Condominium as a joint tenant, a presumption exists under West Virginia law that she owns an undivided one-half interest in the property. Ms. Ball further states that no party has produced sufficient evidence to rebut that presumption and that she is therefore entitled to her one-half interest in the proceeds from the sale of the Condominium.

4

"In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law." *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992); *see also In re Oswald*, 90 B.R. 218, 221 (Bankr. N.D.W. Va. 1988) ("West Virginia law on joint tenancies is controlling in determining what the debtor's interest and, therefore, the estate's interest is in the jointly owned property."). Pursuant to West Virginia law, when a husband and a wife take title to property as joint tenants, a presumption exists that each joint tenant holds an undivided one-half interest in the property. *E.g.*, *Herring v. Carroll*, 300 S.E.2d 629, 634 (W. Va. 1983) (holding that when the wife conveyed her interest in a joint tenancy to a son from a previous marriage, that son became the one-half owner of the property, which was the extent of the wife's interest); *Wartenburg v. Wartenburg*, 100 S.E.2d 562, 565 (W. Va. 1957) ("[T]he deeds mentioned created joint tenancies in the grantees, vesting in each an undivided one half interest in the properties conveyed, subject to the survivorship rights of each other."). *See also Oswald*, 90 B.R. at 221 ("Under West Virginia law, the debtor in the case at hand [a joint-tenant] owns a one-half undivided interest in the jointly owned real estate . . . ."). When a creditor of one of the joint tenants attempts to collect on that joint tenant's share of the jointly held real property, the West Virginia Supreme Court of Appeals has determined that the creditor is only entitled to the joint tenant's interest – one-half of the property. *E.g.*, *Vincent v. Gustke*, 336 S.E.2d 33, 35 (W. Va. 1985) (holding that a creditor of one joint tenant could execute a judgment against that joint tenant's interest, sever the joint tenancy to create a tenancy in common, and then seek partition of the judgement debtor's one-half interest in the property); *Harris v. Crowder*, 322 S.E.2d 854, 857 (W. Va. 1984) ("[A] a joint tenant may bring an action to partition, and that the court will partition the property in kind or by sale, but only if no prejudice will result to the other joint tenant.").

Moreover, the fact that one spouse does not earn income does not mean that the non-income producing spouse has not paid consideration for the acquisition of property.[2] Pursuant to W. Va. Code § 48-1-233(1), the income of the wage earning spouse is marital property, and a presumption exists that

---

[2] Pursuant to 11 U.S.C. § 548(d)(2)(A), and W. Va. Code § 40-1A-3, a person does not pay "value" for property in the context of fraudulent transfer laws if the "value" given consists of an unperformed promise to furnish support for the debtor or another person.

5

the non-income producing spouse is entitled to one-half of all that income. § 48-7-101. Indeed, one spouse's non-monetary contributions may be precisely the reason why the other spouse is able to earn income.[3] *E.g.*, *Arneault v. Arneault*, No. 32865, 2006 W. Va. LEXIS 90 at *24-28 (W. Va. Oct. 5, 2006) (holding that where one spouse is a homemaker and the other spouse earns income, the presumption is that the non-working spouse is entitled to a 50/50 equitable distribution split of all the husband's earnings);

Accordingly, the fact that legal title to the Condominium is held by the Debtor and Ms. Ball as joint tenants establishes a presumption that they each own an undivided one-half interest in the property. Likewise, because no indication exists that Mr. Ball purchased the Condominium with his separate property, Ms. Ball has paid consideration for the Condominium insofar as it was apparently purchased with marital property.

**B.   Fraudulent Transfer**

As a result of the Debtor's unethical acts, and concomitantly as a result of the $2,978,848 restitution order, the creditors of the Debtor argue that any distribution of funds to Ms. Ball should be delayed pending further discovery. More specifically, the Debtor's creditors allege that the Debtor may have used a portion of the unethically retained funds to purchase the Condominium at a time when he had notice that he could be held liable for accepting such payments. By placing the title to the Condominium in the name of both the Debtor and his spouse, the Debtor was attempting to place a portion of the property beyond the reach of one or more of his creditors. As such, the creditors argue, placing a one-half

---

[3] West Virginia courts have the power to approve a division of jointly held real property in unequal shares in the context of a dissolution of marriage proceeding. *E.g.*, W. Va. Code § 48-7-103 (allowing for a distribution of marital property in unequal shares). West Virginia's domestic relations laws on the unequal division of jointly owned marital property, however, are not applicable to a creditor's attempts to seize a non-debtor spouse's interest in jointly owned property. *E.g.*, *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 395-403 (1987) (limiting standing to assert statutory rights to those protected within the statute's zone of interest); *St. Joseph Hosp. v. Rizzo*, 676 A.2d 98, 99 (N.H. 1996) (holding that a hospital attempting to collect on husband's medical bill did not have standing to enforce the wife's support obligation to her husband); *Clar v. Cacciola*, 193 Cal. App. 3d 1032, 728 (Cal. Ct. App. 1987) (holding that a creditor does not have standing to avail itself of a statue designed to protect spouses).

6

interest in the property in the name of Ms. Ball might have been a scheme to delay or defraud the Debtor's individual creditors.

Section 548(a)(1) of the Bankruptcy Code allows a trustee to avoid a fraudulent transfer that was made or incurred within two years before the date of the filing of the petition. The Debtor filed this case on October 31, 2006 – the allegedly fraudulent transfer took place on December 12, 2003;[4] thus, the Bankruptcy Code's fraudulent transfer avoidance action appears to be time-barred.

Pursuant to § 544(b)(1) of the Bankruptcy Code, however, the trustee "may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim . . . ." 11 U.S.C. § 544(b)(1). "Applicable law" as used in § 544(b)(1) includes applicable state law. *E.g.*, *Schilling v. Heavrin (In re Triple S Rests., Inc.)*, 422 F.3d 405, 410 (6th Cir. 2005) (stating that a trustee may bring state law causes of action assertable by unsecured creditors), *cert. denied*, 127 S. Ct. 189 (2006); *In re Harbour*, 840 F.2d 1165, 1170-71 (4th Cir. 1988) ("[S]ection 544(b) gives trustees in bankruptcy the same authority to avoid transfers that an unsecured debtor would have under state law."), *vacated on other grounds*, 492 U.S. 913 (1989). Under West Virginia law, when considering transactions that may be fraudulent as to present and future creditors, a creditor has four years after the allegedly fraudulent transfer was made to bring that cause of action; thus, a State law cause of action to avoid the December 5, 2003 transfer of an interest in real property to Ms. Ball as fraudulent would be timely. W. Va. Code § 40-1A-9(a-b). Pursuant to West Virginia law:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or

---

[4] The Debtor and Ms. Ball purchased the Condominium on December 5, 2003. Pursuant to 11 U.S.C. § 548(d)(1), however, "a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee . . . ." In cases of real property, a transfer is perfected against a bona fide purchaser at the time the transfer is recorded in the county where the real property is located. W. Va. Code § 40-1-9. The deed to the Debtor and Ms. Ball was recorded on December 12, 2003; thus, that is the date of the transfer for purposes of 11 U.S.C. § 548.

7

> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor:
>> (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>> (ii) Intended to incur, or believed or reasonably should have believed that he (or she) would incur, debts beyond his (or her) ability to pay as they became due.

§ 40-1A-4(a).

Based on the arguments of the Debtor's creditors, the Debtor had unethically received (as later determined) $1,942,291 in funds from the estates of Ms. Michael and Ms. Davis before the Debtor and Ms. Ball purchased the Condominium on December 5, 2003. Also, before purchasing the Condominium, the Debtor may have had notice that he would have to repay all or a portion of the $1,942,291 he had received from the decedent's estates based on notice of a disciplinary complaint filed against him by the West Virginia Disciplinary Board in December 2002. Ultimately, the Debtor, individually, became liable to make $2,978,848 in restitution based on his unethical conduct. By purchasing real property with his spouse and taking title to the real property as joint tenants with a right of survivorship, the creditors argue, the Debtor was attempting to put one-half of the property beyond their reach because what may have been formerly fungible personal property out of which the creditors might have obtained full satisfaction,[5] was converted into real property out of which the creditors may only be entitled to the Debtor's one-half interest. *See, e.g.*, *In re Oliver* 44 B.R. 989, 990-91 (D. Mass. 1984) (finding that retitling one form of entireties property whereby it could be held liable for the husband's debts only, to another form of entireties property whereby is could only be held liable for the husband and wife's joint debts, was a fraudulent transfer); *Whittom v. Kroll (In re Whittom)*, 220 B.R. 365, 369-70 (Bankr. C.D. Ill. 1998) (holding that

---

[5] For example, in the case of jointly held bank accounts, West Virginia has, by statue, modified the joint ownership rules applicable to real property to provide that all funds in a jointly held deposit account may be paid to a creditor of only one of the joint account holders. W. Va. Code § 31A-4-33(d) ("[T]he entire balance of [a joint deposit account] may be paid to a creditor . . . of any one of the joint tenants pursuant to legal process . . . .").

8

the transfer of marital property held in a joint tenancy to one held in an tenancy by the entirety was a fraudulent transfer when done to shield the property from a spouse's individual creditors).

Importantly, whether or not the Debtor and/or Ms. Ball acted with the actual intent to hinder, delay or defraud any creditor of the Debtor is a question of fact that need not be determined by the court at this time. All the creditors are asking is that the court escrow the sale proceeds pending a determination of whether the transfer of personal property, in which Ms. Ball had a marital interest, to real property, held as joint tenants with a right of survivorship, was fraudulent as to the Debtor's present and future creditors. If successful, the creditors argue that they could avoid Ms. Ball's interest in the Condominium and use the entire proceeds of the sale in partial satisfaction of their judgment.

**C.     Section 363(j)**

Ms. Ball argues that, even if a claim could be stated against her to avoid a fraudulent transfer, no such action has been filed, and § 363(j) of the Bankruptcy Code mandates that she immediately receive her one-half interest in the Condominium.

The sale of the Condominium was approved by the court on December 21, 2006, pursuant to 11 U.S.C. § 363(h), which allows the Debtor to sell both the estate's interest in property as well as the interest of any co-owner of that property. All parties agreed in this case that the sale of property pursuant to § 363(h) is proper. Regarding the distribution of sale proceeds, the Bankruptcy Code provides:

> After a sale of property to which subsection (g) or (h) of this section applies, the trustee shall distribute to the debtor's spouse or the co-owners of such property, as the case may be, and to the estate, the proceeds of such sale, less the costs and expenses, not including any compensation of the trustee, of such sale, according to the interests of such spouse or co-owners, and of the estate.

11 U.S.C. § 363(j).

At least one court has ordered an escrow of a non-debtor, co-owner's portion of sale proceeds pending a resolution of a state court partition in which the debtor had sued the co-owner for damages. In *Stine v. Diamond (In re Flynn)*, 297 B.R. 599, 601 (B.A.P. 9th Cir. 2003), the Chapter 7 debtor was involved in an "acrimonious state court partition action" when he filed bankruptcy. The debtor had pending claims for contribution, maintenance, and breach of a fiduciary duty against the co-owner, Stine. *Id.* After filing bankruptcy, the Chapter 7 trustee and Stine agreed to sell the property, and about $120,000 in net

9

proceeds were realized from the sale. *Id.* at 601-02. The bankruptcy court ordered an escrow of the amounts otherwise payable to Stine as the undisputed co-owner, pending a resolution of the debtor's state court claims against her. *Id.* at 606. The B.A.P. affirmed that decision, holding:

> Until one knows what the appropriate adjustments are under California law, one cannot determine the net cash value of Stine's share.
>
> The contribution and breach of fiduciary duty issues remaining between Stine and the estate are part of the underlying partition action, which must be resolved in its entirety before full distribution is practicable. If there is a significant portion of Stine's share of the net proceeds to which she is unquestionably entitled, a prompt partial distribution might be appropriate . . . . Any portion subject to controversy, however, may properly be withheld.

*Id.*

The United States Court of Appeals for the Ninth Circuit, however, reversed the B.A.P.'s and bankruptcy court's holdings that such an escrow was proper. 418 F.3d 1005, 1008 (9th Cir. 2005). Reading the "plain language" of § 363(j), the court determined that the statute "mandates that, after the sale of co-owned property, 'the trustee *shall* distribute to . . . the co-owner of such property . . the proceeds of such sale . . . according to the interest of such co-owner and the estate' " *Id.* (emphasis in original) (quoting 11 U.S.C. § 363(j)). Because the plain language directed an "immediate" distribution, the Ninth Circuit held that the bankruptcy court erred when it permitted the trustee to indefinitely withhold Stine's portion of the sale proceeds. *Id. See also In re Ferris*, No. 02-20785, 2006 Bankr. LEXIS 3693 at *33 (Bankr. E.D. Cal. Dec. 22, 2006) ("A trustee cannot withhold proceeds of a sale that are due a co-owner of property. The trustee must turn over the co-owner's share of sale proceeds immediately upon the close of sale.") (unpub.).

Likewise, in *Aino v. Maruko, Inc. (In re Maruko Inc.)*, 200 B.R. 876 (Bankr. S.D. Cal. 1996), the bankruptcy court refused to escrow proceeds from the sale of various properties that belonged to the properties' co-owners. Maruko's Chapter 11 petition was filed in tandem with a reorganization case in Japan. *Id.* at 878. In the Japanese proceeding, various co-owners of property held in the United States had filed "cancellation claims," which, if successful, would effectively deny them status as co-owners. *Id.* at 880. The debtor argued that it should not have to pay the proceeds from the sale of its properties to the

10

co-owners when they, ultimately, may not be entitled to any proceeds. *Id.* In analyzing § 363(j) of the Bankruptcy Code, the court reasoned that the statute does not specify the date as of which a co-owner's interest in property is to be determined; however, § 363(j) was linked to § 363(h), which directs that the applicable property interest are those that existed as of the commencement of the case. *Id.* at 882; 11 U.S.C. § 363(h) ("[T]he trustee may sell both the estate's interest . . . and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest . . . ."). After determining that interests in co-owned property were defined as of the petition date, the court concluded that no justification existed to escrow the co-owner's share of sale proceeds because:

(1) § 363(j) is phrased in mandatory terms ("the trustee shall distribute to . . . the co-owners . . . the proceeds of such sale . . . .");

(2) The legislative history supported an immediate distribution because the purpose of § 363(j) is to protect the co-owner's interest in the event that the estate sells the property to someone other than the co-owner;[6] and

(3) Immediate distribution of the co-owner's portion of the proceeds avoids offense to the Constitution by providing the co-owners with their expectation of compensation.

---

[6] The legislative history contains the following statements:
The bill also changes the rules with respect to marital interests in property. Interests in the nature of dower and curtesy will not prevent the property involved from becoming property of the estate, nor will it prevent sale of the property by the trustee. With respect to other co-ownership interest, such as tenancies by the entirety, joint tenancies, and tenancies in common, the bill does not invalidate the rights, but provides a method by which the estate may realize on the value of the debtor's interest in the property while protecting the other rights. The trustee is permitted to realize on the value of the property by being permitted to sell it without obtaining the consent or a waiver of rights by the spouse of the debtor or the co-owner, as may be required for a complete sale under applicable State law. The other interest is protected under H.R. 8200 by giving the spouse a right of first refusal at a sale of the property, and by requiring the trustee to pay over to the spouse the value of the spouse's interest in the property if the trustee sells the property to someone other than the spouse. Similar rules will govern certain sales of community property if both spouses are not preceding under title 11.

H.R. 8200, 95th Cong., 1st Sess. 177 (1977).

11

*Id.* at 882-83.

Finding no legal basis to escrow the sale proceeds, the court in *Maruko* examined whether an equitable basis existed to order an escrow of the funds on the strength of the debtor's argument that immediate payment would place it in the difficult position of later having to recover the payments it made to the co-owners if their cancellations claims were successful. *Id.* at 883. The court did not find that any equitable basis existed to escrow the funds – to the extent that an equitable exception to the language of § 363(j) even exists – because the debtor had not demonstrated that the Japanese court would be unable to adjust the co-owner's claims in that proceeding consistent with payments made by the debtor in its United States bankruptcy. *Id.* at 884.

This court agrees with the Ninth Circuit in *Flynn* and the bankruptcy court in *Maruko*. First, as cited by both those courts, the language of § 363(j) mandates a co-owner of property receive that co-owner's interest. Second, the legislative history to §§ 363(h) and (j) demonstrate a Congressional concern that a co-owner's interest in jointly held property be protected when sold by a trustee. The court would not be giving effect to the intent of Congress in ordering an indefinite escrow of a co-owner's interest in property based solely on the language of § 363(j).[7] Third, ordering an immediate payment to a co-owner alleviates any Constitutional concerns about an arm of the federal government ordering the withholding of property belonging to a party without compensation. Finally, all that exists at this time are allegations that converting personal property into real property, and taking title to that real property as joint tenants, is a fraud on the Debtor's individual creditors. No lawsuit has been filed to avoid Ms. Ball's interest and there has been no adjudication of wrongdoing or avoidance. While § 363(j) does not exactly specify that a co-owner receive the co-owner's share as of the date of the sale, the parties in this case are only resorting to § 363(j) because the sale of the Condominium is being made pursuant to § 363(h), which directs the court

---

[7] Neither *Flynn* nor *Maruko* should be read to mean that the trustee must immediately pay a co-owner a portion of sale proceeds when the extent of that co-owner's interest in the property is undetermined. The bankruptcy court would be well within the requirements of the statute to escrow sale proceeds pending a determination of the co-owner's interest in the property. In this case, however, whether one uses the petition date or the sale date as the applicable time for determining a party's interest in co-owned property, Ms. Ball's interest is presently defined pursuant to West Virginia law on joint tenancy.

to look at the parties' interest in property as of the petition date. As of the petition date, Ms. Ball was a co-owner of the Condominium because she is listed on the deed to the Condominium as a joint tenant; thus, the nature of her interest is presently defined. In sum, at this time, Ms. Ball is a co-owner of the Condominium and § 363(j) mandates that Ms. Ball receive her interest in the Condominium as a co-owner; therefore, she is entitled to her share of the proceeds on the completion of the sale pursuant to § 363(j).[8]

**D.      Pre-Judgment Attachments**

Even though Ms. Ball is entitled to her share of the proceeds when the Condominium is sold under § 363(j), that does not mean that the Debtor's creditors cannot do anything from preventing those proceeds from being paid to Ms. Ball outside the confines of § 363(j). Ms. Ball argues that any such effort is a prohibited pre-judgment attachment.

In *Grupo Mexicano De Desarrollo v. Alliance Bond Fund*, 527 U.S. 308 (1999), the United States Supreme Court determined that, in a legal action for money damages, a federal district court lacked the power to issue a preliminary injunction preventing a defendant from transferring assets in which no lien or equitable interest was claimed. Groupo Mexicano owed the petitioners about $80.9 million dollars, and in ordering the preliminary injunction prohibiting it from transferring notes and receivables, the district court determined that the petitioners demonstrated irreparable injury, an almost certainty that the petitioners would succeed on the merits of the claim, and that without the injunction, any judgment obtained would be

---

[8] While the court recognizes the USTE's argument that it has inherit equitable powers under 11 U.S.C. § 105(a), that grant of power "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986). As the United States Supreme Court has admonished, "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988). Accordingly, the court will not use its § 105(a) powers to accomplish a result under § 363(j) that it believes is contrary to the statute.

The cases cited by the USTE, and the injunctions issued therein, are inapposite to the facts of this case. *See NLRB v. Superior Forwarding, Inc.*, 762 F.2d 695, 698 (8th Cir. 1985) (enjoining federal regulatory proceedings against the debtor when those proceedings threatened the assets of the debtor's estate); *Alexander v. Jensen-Carter (In re Alexander)*, 289 B.R. 711, 715-16 (B.A.P. 8th Cir.) (enjoining a debtor from filing further motions related to the trustee's administration of the estate), *aff'd* 80 Fed. Appx 540 (8th Cir. 2003).

13

frustrated based on Groupo Mexicano's insolvency and plans to distribute its assets to its Mexican creditors. *Id.* at 312. Traditionally, the Supreme Court reasoned, a creditor must obtain a judgment before attaching a debtor's property – this is the recognition "of the substantive rule that a general creditor (one without a judgment) had no cognizable interest, either at law or in equity, in the property of his debtor, and therefore could not interfere with the debtor's use of that property." *Id.* at 319-20. Only after a judgment has been obtained does the creditor have an interest in the property of the debtor upon which action may be taken. *Id.* at 323.

*Grupo Mexicano*, however, involved an action for money damages in a court of law. At issue in this case is a potential fraudulent transfer avoidance action against the Debtor and Ms. Ball as a result of placing title to the Condominium in their names as joint tenants. Fraudulent transfer actions seeking to set aside a transfer of land are traditionally equitable causes of action to which the holding of *Group Mexicano* would not apply. *E.g.*, *Id.* at 325 (stating that cases where the cause of action was equitable relief were not relevant to the Court's decision); *Granfinanciera, S. A. v. Nordberg*, 492 U.S. 33, 44 (1989) (" 'If . . . the subject matter is land or an intangible . . . the trustee . . . may invoke the equitable process, and that also is beyond dispute.' ") (citation omitted).

In determining whether to preliminary enjoin a party's use of property, Fed. R. Civ. P. 65 establishes the relevant considerations that a court should undertake before granting an injunction – namely that the party seeking the injunction will suffer an irreparable harm without it. Fed. R. Civ. P. 65; Fed. R. Bankr. P. 7065. The Court of Appeals for the Fourth Circuit uses a four part test in determining whether to a preliminary injunction should be issued: "1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is not granted; 2) the likelihood of harm to the defendant if the preliminary injunction is granted; 3) the likelihood that plaintiff will succeed on the merits; and 4) the public interest." *Hughes Network Sys. v. Interdigital Communications Corp.*, 17 F.3d 691, 693 (4th Cir. 1994). These four factors are not equally weighted – "[t]he 'balance of hardships' reached by comparing the relevant harms to the plaintiff and defendant is the most important determination . . . ." *Id.*

In this case, the Court believes that the record is currently insufficient for it to make the determinations required by the Fourth Circuit in issuing a preliminary injunction. For example, the court does not know what damage, if any, the putative plaintiffs would suffer in the event Ms. Ball receives her

14

interest in the sale proceeds of the Condominium. Likewise, the court does not know what impact, if any, a failure to receive those sale proceeds will have on Ms. Ball. Moreover, a determination of the likelihood of success on the merits of a fraudulent transfer action is problematic because – while the parties have outlined possible causes of action against the Debtor and Ms. Ball – no adversary proceeding has been filed.

### E. Setoff

The USTE asserts that the bankruptcy estate may have claims and/or causes of action against Ms. Ball that are subject to setoff from any distribution that she may be entitled to; thus, the USTE asserts, this court should order the escrow of the sale proceeds until such time as those setoff rights may be determined. For example, the USTE identifies potential claims by the estate against Ms. Ball totaling $171,000, representing an $82,000 gift from the Debtor to Ms. Ball, the receipt of a 2005 Volvo, and $64,000 received by Ms. Ball from the estates of Mses. Michael and Davis.

Before asserting setoff rights, however, there must be some debt that the estate owes to Ms. Ball. 11 U.S.C. § 553(a) (requiring that a debt must be "mutual" before being subject to setoff). In this case, there is no showing that the estate owes Ms. Ball any money; her interest as a co-owner in the Condominium is not – at this time – property of the estate. § 541(a)(1) (stating that only the debtor's legal and equitable interests in property become property of the bankruptcy estate). Because it has not been shown that the estate owes Ms. Ball any money, no setoff is appropriate at this time.

### F. Jurisdiction

Ms. Ball contends that this court is without any jurisdiction to adjudicate a dispute between herself and the Debtor's creditors regarding any alleged state law fraudulent transfer and any possible constructive trust remedy. The court disagrees.

The Debtor's motion to approve the distribution of sale proceeds and the objections thereto form a core bankruptcy proceeding because if the anticipated adversary proceeding against Ms. Ball is successful, the "transfer" of a one-half ownership interest in the Condominium may be avoided and the property would come fully into the estate to pay the Debtor's creditors. Therefore, this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (H), (N), and (O).

### III. CONCLUSION

For the above-stated reasons, the court finds that Ms. Ball is presently entitled to a one-half ownership interest in the proceeds from the sale of the Condominium and that immediate payment of those proceeds to Ms. Ball would be otherwise proper pursuant to 11 U.S.C. § 363(j). The court cannot ignore, however, the serious nature of the allegations of the USTE, the Foundation, and Mr. Stone regarding the possible fraudulent transfer of the Condominium in an alleged effort to hinder, delay, or defraud the Debtor's individual creditors, or the undeniable public interest in the orderly liquidation of the Debtor's assets to pay the Debtor's order of restitution. Therefore, the court will enter an order that: (1) continues the Debtor's motion to approve the disbursement of proceeds; (2) converts the objections filed by the USTE, the Foundation and Mr. Stone to the Debtor's motion to approve the disbursement of proceeds into a motion for a preliminary injunction under Rule 65;[9] (3) sets a date for a hearing on a preliminary injunction that would prohibit the immediate payment of the Condominium's sale proceeds to Ms. Ball pursuant to Fed. R. Civ. P. 65, and (4) that directs ethe USTE, the Foundation, and/or Mr. Stone to, at a minimum, outline the possible causes of action against Ms. Ball, the elements of that cause of action, and why or why not those parties believe that they could be successful on the merits of that litigation should they be allowed to pursue such causes of action in lieu of the Debtor.

---

[9] The court is converting the objections to the Debtor's motion to approve the disbursement of sale proceeds into motions for a preliminary injunction because those objection request the court to enter affirmative relief in favor of the objectors, and such a transmogrification is an appropriate exercise of the court's inherent powers under 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."). The court is likewise converting the reply of Anita Ball to the objections to the Debtor's motion to approve disbursement of sale proceeds into a response to the motions for a preliminary injunction. While a motion for a preliminary injunction is ideally raised in the context of an adversary proceeding, the court has the power to make Fed. R. Bankr. P. 7065 applicable to contested matters, which is what the court deems this proceeding to be at this time. *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 306 B.R. 43, 50 (Bankr. S.D.N.Y. 2004) (noting that the court converted a landlord's objection to rejection notices into a motion for payment of administrative expenses).